**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CASE NO. 3:26-CR-14 |
| v. | ) | |
| | ) | JUDGES CRYTZER/McCOOK |
| TYLER SHANE WELLS, *et al.* | ) | |

**UNITED STATES RESPONSE IN OPPOSITION**
**TO DEFENDANT WELLS'S MOTION TO DISMISS**
**FOR DUE PROCESS VIOLATIONS**

The Sixth Circuit's precedential decision in *United States v. Damra*, 621 F.3d 474 (6th Cir. 2010), controls. (R. 113, PageID#: 776). Wells must show (1) that the government acted in bad faith and (2) that the missing testimony would have been material and favorable. He fails both. The illegal alien witnesses asked to leave; the United States did not deport them to silence them. Most applied for voluntary departure under 8 U.S.C. § 1229c—the Immigration and Nationality Act's voluntary-departure provision—at their own request, and the government merely consented. The motion should be denied.

### 1. Wells misstates the governing constitutional standards.

Two problems sit at the core of Wells's motion.

First, Wells inverts *Damra*. He states that a defendant "must demonstrate materiality and favorability . . . by a plausible description of 'the events to which a witness might testify, and the relevance of those events to the crime charged.'" (R. 113, PageID#: 779). The Sixth Circuit said something different: it holds that those events "may well demonstrate either the presence or absence of the required materiality." *Damra*, 621 F.3d at 487 (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 871 (1982)). The difference is the difference between "must" and "may." Under Wells's rewrite, listing the events satisfies the prong; under *Damra*, listing the events is one

way the defendant might satisfy the prong—and only if the listing in fact demonstrates materiality. Wells's mistaken interpretation eliminates the showing he was supposed to make.

Difficulty is not relaxation. Wells overstates *Valenzuela-Bernal*. His motion claims the materiality showing is "generally relaxed" and that "the specificity threshold of the required materiality showing" is "lowered." (R. 113, PageID#: 779–80). The Supreme Court did not lower the threshold; it said only that a defendant who has not interviewed the witness "may face a difficult task in making a showing of materiality," but "the task is not an impossible one." *Valenzuela-Bernal*, 458 U.S. at 871. The *Valenzuela-Bernal* Court was emphatic: the absence of an interview "does not . . . relieve the defendant of the duty to make some showing of materiality." *Id.* at 873. Wells leans on Justice O'Connor's *Valenzuela-Bernal* concurrence—language about a "governmental policy of deliberately putting potential defense witnesses beyond the reach of compulsory process . . . ." (R. 113, PageID#: 777). That language, besides being factually incorrect in the context of this case—that the deported illegal aliens would be favorable "defense witnesses" to Wells—is from a concurrence, not the holding; the *Valenzuela-Bernal* majority leaves the "duty to make some showing of materiality" intact, and *Damra* follows the majority. A concurrence does not displace the holding. Wells himself concedes that *Damra* controls. (R. 113, PageID#: 776). He says he wants to "preserve" the issue for appellate challenge. However, regardless of what Wells seeks to preserve, this Court must apply *Damra* as the Sixth Circuit wrote it—with Wells failing on both prongs.

### 2. Wells cannot meet his initial burden of showing governmental bad faith.

The first *Damra* prong asks whether the government acted in bad faith. 621 F.3d at 489–90. The Sixth Circuit set bad faith as the threshold question because it aligned itself with *Arizona v. Youngblood*, 488 U.S. 51 (1988): the Due Process Clause is offended only when the government acts in bad faith with respect to potentially useful evidence. *Damra*, 621 F.3d at 489. Wells must

2

therefore make "an initial showing that the government has acted in bad faith." *Id.* Only after meeting that threshold does the Court reach materiality. *Id.* at 489–90.

Wells cannot make that showing. The United States did not deport these illegal alien witnesses to silence them. Most left voluntarily under 8 U.S.C. § 1229c. As Wells's own motion concedes, "voluntary departure was agreed to by the Attorney General in several of the individuals' cases." (R. 113, PageID#: 778). The Eleventh Circuit has described § 1229c precisely: "The Immigration and Nationality Act gives the Attorney General discretion to permit aliens to voluntarily leave the country at their own expense." *Blanc v. United States Att'y Gen.*, 996 F.3d 1274, 1278 (11th Cir. 2021) (citing 8 U.S.C. § 1229c(a)(1)). Voluntary departure (VD) is not deportation. And the United States did not put these witnesses beyond the reach; the illegal aliens put themselves there after fleeing from Wells's Hardin Valley construction site and attempting to hide in and amongst the homes in an adjacent neighborhood.

Wells's own factual record proves the point. C.R.P. filed a Joint Motion for Voluntary Departure together with the Department of Homeland Security; the addendum was signed January 30, 2026. (R. 113, PageID#: 778). That is what a voluntary application looks like—joint, signed, and at the alien's request. C.R.P. asked to leave, the United States consented, and he left. Two different agencies operate here under different statutory authorities. The Department of Justice, via the U.S. Attorney's Office, criminally prosecutes Wells, Bonilla-Serna, Bonilla-Servin, and Pastore; Immigration and Customs Enforcement (ICE), through its Enforcement and Removal Operations (ERO) component, conducts administrative removal proceedings. To attribute ICE-ERO's lawful exercise of its statutory functions to the prosecuting U.S. Attorney's Office is not bad faith—it is structural confusion.

A.T.R. proves the point twice. According to the I-213 form, A.T.R. "was amenable to and declined incentivized VD" at the time of his initial detention. (R. 113, PageID#: 778). Yet on

February 23, 2026—more than a month later—A.T.R. was granted pre-conclusion voluntary departure under § 240B(a). (*Id.*). Wells's own motion thus shows the government did not push A.T.R. out the door. A.T.R. was given an option, declined it, and was nonetheless granted a voluntary departure that he later sought. That sequence is the opposite of bad faith. The same pattern holds across the remaining witnesses. Each either applied for voluntary departure or departed under a reinstated prior removal order under 8 U.S.C. § 1231(a)(5)—a separate statutory track administered by ICE-ERO, not the Department of Justice. Wells's own exhibits confirm as much for every witness named in his motion.

Wells leans on the United States' detention-hearing argument that the missing-witness conduct was "active obstruction" and that the illegal alien witnesses fleeing the jobsite were "material witnesses." (R. 113, PageID#: 780). Wells then misreads what that argument said. The government argued that the fleeing illegal aliens were material to the United States—to its investigation of Wells's harboring conspiracy and to its prosecution of the illegal aliens under immigration laws. The United States did not argue that the illegal aliens were material or exculpatory or in any way favorable to Wells's, or any of his coconspirators', defense. A witness can be material to the prosecution's case while offering nothing favorable to the defense; the two propositions are not equivalent. Wells's mistaken attempt to flip the detention-hearing script into a concession is not a *Damra* showing of bad faith.

Nor does Wells's anachronistic framing of the prosecution as having begun with the January 13 incident hold up. (R. 113, PageID#: 774). Wells's own statements to the FBI establish a pre-January 13 enforcement action timeline. Wells acknowledged that the Sagittarius construction site had been operational since September 2025; that ICE had been "conducting surveillance over the last several months" around the site; and that "before Christmas ICE arrested three of the workers." (Wells 302, FBI Bates 089E-NV-4187875_0000002 (Jan. 19, 2026)). The

conspiracy was ongoing and well-developed by the time Bonilla-Servin blocked the site's entrance and caused his truck to collide with the officer's Jeep on January 13; it—the conspiracy—was not occasioned by that vehicle collision. The voluntary-departure proceedings the illegal aliens themselves initiated in late January and February 2026 were the routine end of an immigration enforcement track that had been running parallel to Wells's and his coconspirators' harboring conduct for months. The detention hearing was January 27, 2026; on January 30, three days later, H.H.F. was granted voluntary departure. (R. 113, PageID#: 778). The detention hearing did not produce H.H.F.'s voluntary-departure paperwork; H.H.F. asked to go home.

Wells also leverages the Court's detention-order finding that the workers were "relevant witnesses." (R. 113, PageID#: 780). That conflation does not survive scrutiny. The Court found the workers "relevant" for the limited purpose of detention—assessing whether Wells's release would risk witness obstruction. The Court did not find their testimony "material and favorable" to Wells's defense. A relevance finding made for detention purposes is not a *Damra* finding of materiality and favorability to the defense. The two questions ask different things.

Wells relies on *United States v. Bresil*, 767 F.3d 124 (1st Cir. 2014), and *United States v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012). (R. 113, PageID#: 776). That reliance is misplaced for two reasons. Both involved outright deportation by the government, not alien-initiated voluntary departure. *See Bresil*, 767 F.3d at 130; *Leal-Del Carmen*, 697 F.3d at 968. And even on its own terms, *Bresil*'s three-factor framework requires the same bad-faith showing Wells cannot make. 767 F.3d at 130. Importantly, the Sixth Circuit has also not adopted *Leal-Del Carmen*'s Ninth Circuit prophylactic—the rule requiring the government to obtain district-court permission before deporting a witness. The Tenth Circuit likewise rejects any automatic-prejudice rule, requiring a showing of government bad faith instead. *See United States v. Iribe-Perez*, 129 F.3d

5

1167, 1173 (10th Cir. 1997). Even if the Sixth Circuit had adopted that rule, it would govern government-initiated deportation, not voluntary departure granted at the illegal alien's request.

Wells's final bad-faith argument—that the government "knew" these illegal alien witnesses might be material because it argued so at the detention hearing, (R. 113, PageID#: 780)—is both a mistaken interpretation of the government's argument and it confuses knowledge with bad faith. *Damra* requires the latter. 621 F.3d at 489. Following the statute Congress wrote is the opposite of bad faith. *See Valenzuela-Bernal*, 458 U.S. at 864–66 (recognizing the government's interest in enforcing immigration laws); *California v. Trombetta*, 467 U.S. 479, 488 (1984) ("In failing to preserve breath samples for respondents, the officers here were acting 'in good faith and in accord with their normal practice.' The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence.") (internal citation omitted). Additionally, Wells's excerpted statements from the detention hearing undermine his argument. For example, Wells cites the government's detention argument: "All these individuals that he's causing to disappear are *material witnesses* and he knows that. *That's active obstruction*, not only generally in investigations but in…the government's *prosecution of this case* before this Court." (R. 113, PageID#: 780) (emphasis supplied). The words "obstruction" and "prosecution" refer to incriminating, inculpatory sources of evidence and information against Wells and his coconspirators, not exculpatory, favorable evidence for him.

Finally, this case was part of the government's broad and sustained federal immigration enforcement effort. For months, Wells ran his Hardin Valley construction site as a mini-sanctuary city, and he was its mayor. Wells and his coconspirators were determined to impede, obstruct, and threaten federal immigration officers whenever and however possible, to include Bonilla-Servin counter-surveilling the officers across the street, blocking the sanctuary city's entrance, and ultimately colliding with the officers' Jeep as they attempted to enter the site. All this was done

6

for one reason and one reason only: to harbor, conceal, and protect the illegal alien workers on the site, for commercial advantage and private financial gain. In the aftermath of Bonilla-Servin's collision, approximately 30 of Wells's harbored illegal aliens fled his site and hid in and amongst the homes of an adjacent neighborhood, which resulted in several 911 calls from concerned homeowners and deployment of a Knox County Sheriff's Office helicopter to assist in a protracted aerial search of Wells's illegal aliens. Of those 30 illegal aliens, only 6 were apprehended and processed by immigration authorities, which means there are at least 24 illegal aliens of that group who are still at large in the nation's interior. Yet it is these people—the fleeing illegal aliens—who Wells now claims he needs to call as witnesses in his case-in-chief at trial.[1] These fleeing illegal alien witnesses have, however, already benefitted Wells and his coconspirators. By harboring, concealing, and then facilitating the illegal aliens' escape, the government was deprived of the ability to interview them all and not only further corroborate the harboring conspiracy, as reflected in Wells's text messages with his coconspirators, but also to investigate and further develop additional charges, including forced labor, in violation of 18 U.S.C. § 1589, which carries a 20-year maximum sentence.

---

[1]Such testimony would likely never occur. Unlike other constitutional rights that do not apply to non-citizens, each one of those 6 illegal aliens would have a Fifth Amendment right not to testify and incriminate themselves. Although the Supreme Court has held that aliens "enjoy certain constitutional rights . . . when they have come within the territory of the United States and developed substantial connections with this country," it expressly declined to decide whether "the Fourth Amendment applie[s] to illegal aliens in the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271–72 (1990). It also reiterated that some constitutional provisions were "not intended to extend to aliens in the same degree as to citizens." *Id*. at 273; *accord United States v. Escobar-Temal*, 161 F.4th 969, 983 (6th Cir. 2025) (holding that a prohibition against firearm possession by illegal aliens, 18 U.S.C. § 922(g)(5)(A), is consistent with the Second Amendment and the nation's tradition of firearm regulations); *id*. at 986, 997 (Thapar, J., dissenting in part and concurring in the judgment) (opining that, as "[o]riginally understood, neither the First nor Fourth Amendment clearly extends to noncitizens" and that, with respect to the Second Amendment, "illegal aliens are not citizens [and] cannot lay claim to the right to bear arms reserved for 'We, the People.'"). Additionally, only the government, not Wells or his coconspirators, has the authority to immunize any such witness who invokes the Fifth Amendment.

### 3. Wells cannot make a plausible showing of materiality or favorability.

Even if Wells could show bad faith—and he cannot—he must also show that the unavailable testimony "would have been both material and favorable to his defense." *Damra*, 621 F.3d at 489 (quoting *Valenzuela-Bernal*, 458 U.S. at 867). *Valenzuela-Bernal* requires "a plausible showing." 458 U.S. at 873. *Jackson v. Harris*, No. 1:19-cr-01865, 2022 WL 17418193, *21 (N.D. Ohio June 23, 2022), denied a motion under *Valenzuela-Bernal* where, as the court described the *Valenzuela-Bernal* defendant, he "made no effort to explain what material, favorable evidence the deported passengers would have provided for his defense." Wells offers two factual claims; neither carries the burden.

Wells's first claim is that the witnesses would have testified they did not work for him directly. (R. 113, PageID#: 780–81). That testimony is neither material nor favorable. The harboring statute under which Wells and his coconspirators are charged does not require direct employment. Section 1324(a)(1)(A)(iii) makes it a crime when a person "conceals, harbors, or shields from detection" aliens unlawfully present, knowing or in reckless disregard of that fact. 8 U.S.C. § 1324(a)(1)(A)(iii). Wells and his codefendants stand charged in Counts Four through Nine with concealing, harboring, and shielding individuals 1–6—not with employing them. Testimony that the illegal aliens worked for a subcontractor rather than for Wells personally would not exonerate him or his coconspirators. The proof at trial will show that Wells arranged to, in his words, "protect" and "keep safe" the illegal alien workers at his site and keep the illegal alien workers from being "taken" by ICE. Wells's coordinated efforts with his coconspirators included directing subcontractors to have their illegal alien workers vacate Wells's site whenever federal immigration enforcement officers were nearby, letting the subcontractors know when the coast was clear and the illegal workers could return to work at the site, and by personally facilitating the concealment of illegal alien workers who were hiding in the adjacent neighborhood after Bonilla-

Servin counter-surveilled the agents and then caused his truck to collide with the agents' Jeep at the site's entrance on January 13. None of that turns on a direct employer-employee relationship.[2]

Wells's second claim is that two of the witnesses, D.A.G. and H.H.F., have alternative aliases other than the names in the interview summaries. (R. 113, PageID#: 781). That fact does not establish material or favorable testimony. They do not, standing alone, suggest the United States cannot prove the elements of the charged offenses. The indictment identifies each named individual by initials and tracks the I-213 forms. Wells does not explain how an alternate name would alter any element of any harboring count. *Valenzuela-Bernal* stresses that a defendant must describe the substance and relevance of the missing testimony; his bare assertion that the witnesses might help is not enough. 458 U.S. at 871.

Beyond those two arguments, Wells offers no specific factual claim about what the witnesses would testify to. He says they could "refute an allegation that Mr. Wells drove one or more of them to a hotel." (R. 113, PageID#: 782). The indictment does not turn on whether Wells personally drove a particular illegal alien to a hotel on a particular date; the conspiracy and substantive harboring counts rest on a course of conduct documented in text messages, video footage, property records, and corroborating witness statements. A speculative denial of a single trip is not the kind of showing *Damra* demands; instead, precedent requires "some plausible

---

[2]Wells's attempt to create space between his knowledge and the illegal alienage of the workers he and his coconspirators harbored is neutered by the evidence, and Wells's own words. Coconspirator Bonilla-Serna, for example, regularly referred to Wells as "**boss**." In a text exchange from January 7, 2026, Wells told a subcontractor that he (Wells) will keep the subcontractor's workers "**safe**." In response, the grateful subcontractor replied: "That's great, thank you so much for **protecting them**." Wells "loved" that reply and further said, "You are so welcome **I'll do what it takes**." The subcontractor replied, "Thank you for being a person who cares about **your employees**." In response to the text about Wells's employees, Wells said, "You are so welcome I love you all like family **I'll go to war for my people** if they good to me." Wells's late game claim that he knew nothing about the illegal workers he and his coconspirators harbored in his sanctuary city is severely undermined by his prior, memorialized admissions in text messages like these.

showing," not abstract possibilities. *Damra*, 621 F.3d at 489. Wells gestures at categories—direct employment, aliases, denial of a trip—without explaining how any gestured-at fact would alter any element of any count. That is not a plausible showing; it is speculation.

Wells's deeper argument—that the witnesses might have testified they did not work for him directly (R. 113, PageID#: 780–81)—also fails because the knowledge element does not turn on what the witnesses might say. Wells's own text messages, produced in discovery and some of them referenced above, supply independent evidence of his knowledge. Post-January 13 texts with his Elmington-construction supervisor and another subcontractor show Wells acknowledging that workers without papers should not be on the site—admissions that bear directly on § 1324(a)(1)(A)(iii)'s knowledge element regardless of what the illegal alien workers might have said about who cut their paychecks.

Finally, Wells's premise—that he needs the witnesses to contest alienage—misses the proof. The United States can establish each named alien's unlawful presence in the United States through the I-213 forms and the rest of the A-File materials in discovery. Public-records evidence carries that proof. The witnesses' live testimony is not required to establish alienage. Their departures—by voluntary application or by reinstatement of a prior removal order—do not deprive the United States of its proof on this element. They do not deprive Wells of any defense the witnesses' physical presence would have supplied.

*Horton*'s aiding-and-abetting framework changes nothing. The underlying crime is harboring, not employment, and the United States can prove harboring through text messages, surveillance footage, the I-213 forms and other documents in the A files, and witness testimony— without the six departed illegal aliens who unsuccessfully avoided apprehension and processing after fleeing Wells's site. *United States v. Horton*, 847 F.2d 313, 322 (6th Cir. 1988).

10

## CONCLUSION

Wells concedes *Damra* controls. He then misstates *Damra* and *Valenzuela-Bernal* to manufacture a constitutional violation the actual standards do not support. The United States did not deport these witnesses to silence them; most left voluntarily under § 1229c. Wells offers no plausible showing that their unavailable testimony would have been material and favorable as to him. He fails both prongs of the controlling test. The motion to dismiss should be denied.

Respectfully submitted,

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

*s/David P. Lewen, Jr.*
DAVID P. LEWEN, JR.
Assistant United States Attorney
TN Bar No. 042915
800 Market Street, Suite 211
Knoxville, TN 37902
(865) 545-4167
david.lewen@usdoj.gov

*s/ Russ Swafford*
RUSS SWAFFORD
Assistant United States Attorney
Tennessee Bar No. 034803
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
(423) 385-1332
russ.swafford@usdoj.gov

11