**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:26-CR-14** |
| | ) | **JUDGES CRYTZER/McCOOK** |
| | ) | |
| **TYLER SHANE WELLS, et al.** | ) | |

**WELLS'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS FOR VIOLATIONS OF THE DUE PROCESS AND COMPULSORY PROCESS CLAUSES**

Mr. Wells moved to dismiss the Indictment because the Government facilitated the removal of material witnesses. The Sixth Circuit test for a compulsory process claim in the context of deported witnesses requires a defendant to make an initial showing that the government has acted in bad faith and a plausible showing that the testimony would have been favorable and material. *United States v. Damra*, 621 F.3d 474, 489-490 (6th Cir. 2010). The Government takes issue with Mr. Wells's interpretation of *Damra*, stating that the test under *Valenzuela-Bernal* is not a relaxed standard. Doc. 129, PageID# 129. This relaxation of the pleading standard is language that is pulled directly from *United States v. Valenzuela-Bernal*, where the Supreme Court recognized that alleging specificity in how a witness may testify would be impossible when a defendant had not had the opportunity to interview the witness. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 871 (1982). Courts have "recognized the difficult task facing a defendant whose counsel did not have an opportunity to interview deported witnesses in order to determine what favorable information they may possess. However, the Courts have noted that 'this may well support a relaxation of the specificity required in showing materiality . . . .'" *United States v. Lin*, 143 F. Supp. 783, 787-88 (K.Y.E.D. 2001) (quoting *Valenzuela-Bernal*, 458 U.S. at 870); *see also*

*Valenzuela-Bernal*, 458 U.S. at 871 ("a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of how a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality."); *United States v. Damra*, 621 F.3d 474, 487 (6th Cir. 2010) (stating that when a defendant has not had the opportunity to interview the witness, the pleading standard may be relaxed, relying on the rationale in *Valenzuela-Bernal*). The Supreme Court made it clear that when a defendant does not have the opportunity to interview the witness before removal, the defendant does not have to provide a detailed description of how they would testify.

The Sixth Circuit test in *Damra* expands beyond the confines of *Valenzuela-Bernal*. The Sixth Circuit relies on *Youngblood* in reading a bad faith requirement into the test. However, when the Supreme Court created the material and favorable standard, the Sixth Circuit should have applied the precedent outlined in *Trombetta* because the standard applies to exculpatory evidence. *See United States v. Wright*, 260 F.3d 568 (6th Cir. 2001) ("The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith."). Instead, the Sixth Circuit applied the test that is required in cases of potentially useful evidence. *See Arizona v. Youngblood,* 488 U.S. 51 (1988).[1] Mr. Wells maintains that this is not the standard that the Supreme Court set out in *Valenzuela-Bernal*, and the test should not require a showing of bad faith. Nevertheless, Mr. Wells succeeds under the *Damra* test.

---

[1] Mr. Wells understands that *Damra* is binding in this Circuit and raises this issue for the purposes of preservation.

**I.      Voluntary Departure is Analyzed the same as Deportation in the Sixth Circuit.**

As a threshold issue, the Government argues that voluntary departure is not deportation, and thus the Court should not analyze this as the intentional removal. "In this Circuit, the facilitation of a voluntary departure is equivalent to the government's deportation." *United States v. McLernon*, 746 F.2d 1098, 1121 (6th Cir. 1984) (overturned on other grounds) (citing *United States v. Armijo-Martinez*, 669 F.2d 1131 (6th Cir. 1982)).

The Government tries to distinguish between Immigration and Customs Enforcement and the U.S. Attorney's Office. Doc. 129, PageID#833. This argument is meritless. The Attorney General is responsible for overseeing the U.S. Attorney's Office and Immigration Court Proceedings, including both deportation and voluntary departure. The Attorney General is the "head of the Department of Justice" and "shall direct all United States attorneys" in the discharge of their duties. 28 U.S.C. §§ 503, 519. The Government is right that the Secretary of Homeland Security is charged with the administration and enforcement of immigration laws "except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon" the Attorney General. 8 U.S.C. § 1103. The Executive Office for Immigration Review is one of these functions. 8 U.S.C. § 1103(g) ("The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review.").

Further, the duties related to the preservation of evidence, including testimony, in a case are not limited to the prosecutor; those duties are imputed onto the officers and other government agencies investigating the case. *See also Kyles v. Whitley*, 514 U.S. 419, 438 (1995). This is not a case where law enforcement was investigating a murder and witnesses were accidentally deported.

The entire law enforcement operation was centered around an immigration investigation. These witnesses were detained as a part of a targeted law enforcement operation in which local law enforcement, Department of Homeland Security, and the Federal Bureau of Investigation were all involved.

**II.      Mr. Wells can make an Initial Showing of Bad Faith.**

The Government argues that there is no bad faith because the Government has a duty to carry out immigration duties. That is true. It is "the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses **upon the Executive's good-faith determination that they possess no evidence favorable to the defendant** in a criminal prosecution." *Valenzuela-Bernal*, 458 U.S. at 872. "The presence or absence of bad faith by the [government actor] for the purposes of the Due Process Clause must necessarily turn on the [government actor's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Wright*, 260 F.3d 568, 571 (2001); *see also United States v. Fetter*, No. 3:10 CR 411, 2011 U.S. Dist. LEXIS 28666, at *6 (N.D. Ohio Mar. 18, 2011) (citing *Wright*, 260 F.3d at 571). ("A primary factor in determining bad faith of government actors is whether they knew the exculpatory value of the evidence before its destruction.").

It is clear that the Government was aware how important these witnesses were to this case from the beginning. Body cam provided in discovery shows that on January 13, 2026, when Tennessee Highway Patrol responded to the jobsite, immigration officers told the Trooper that they would be handling the criminal charges and all the Trooper needed to do was document the accident report. The interviews by Homeland Security further show that the Government knew that these individuals were witnesses to the criminal investigation. It is clear the individuals were

asked by law enforcement how they arrived to the construction site, who they worked for, and how they were paid. The handbook on interviewing techniques for Homeland Security even addresses *Brady* issues, noting "To avoid jeopardizing a case or potentially incurring other negative consequences, SAs should consult with the AUSA regarding all potential *Brady* information." U.S. Immigration and Customs Enforcement, Homeland Security Investigations: Interviewing Techniques Handbook (May 10, 2017).

The Government interviewed these witnesses for the purpose of criminal prosecution. They knew that individuals did not implicate or otherwise identify Mr. Wells in their interviews. At each phase of the detention process, law enforcement became aware of additional information that compounded the exculpatory nature of their testimony, such as aliases and previous applications for legal status. The exculpatory nature of their statements was evident at the time of their interview and has become more evident since.

### III.     Mr. Wells has Made a Plausible Showing of Materiality and Favorability.

Regarding the plausible showing standard, the United States Supreme Court has stated, "In making such a determination, courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 (1982). The Government's entire argument about materiality and favorability turns on the weight of the evidence. For each description of material and favorable evidence that Mr. Wells identifies, the Government argues that they could point to other evidence to support their claim. However, this is the precise issue that Mr. Wells raises. Mr. Wells is entitled to obtain and present material and favorable evidence, even when the Government believes that it has evidence to the contrary. *See Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014)

(finding a *Brady* violation even where a defendant fully confessed to the offense when interrogated by the police).

The Government argues that Mr. Wells has not established how alternative aliases would be favorable or material. However, he has. The identities of the individuals and their legal status are all at issue here. The Government must prove that these specific individuals were all harbored, concealed, or shielded, as well as each of their legal statuses. An alias or other identity is exculpatory because it puts into issue what identity the worker was using at the time and whether Mr. Wells would have known that this specific individual was present in the country unlawfully.

The Government again states that there are thirty illegal aliens at the jobsite that day. [2] This is not only a factual assertion, but a legal one. Legal status is a legal conclusion. To date, defense counsel has not received A-Files, identities, or any information other than the workers' existence on a jobsite that would support the conclusion that these individuals were present unlawfully. It is unclear if the Government is relying on reports of individuals running from law enforcement and other arrests alone for this legal conclusion or if there is additional evidence that has yet to be turned over.

The Government argues that Mr. Wells is the "mayor of the jobsite" but then argues that testimony that the individuals that he allegedly harbored, shielded, and concealed did not know him directly is not material or exculpatory. [Doc. 129, PageID#836]. If the Government's case turns on the allegation that Mr. Wells is the leader of the "sanctuary city", surely testimony that the workers did not know their "mayor" personally is material and favorable. Doc. 129, PageID#836. There is no question that the individuals who were allegedly harbored are material

---

[2] It is also unclear why this number went from twenty to thirty in the Government's pleadings. *See* Doc. 1.

witnesses. As pointed out in the original motion, the Government represented to the Court repeatedly that the alleged aliens were material witnesses. In the Response, somehow the Government makes the argument that these statements made during the detention hearing do not support Mr. Wells's position because the witnesses are material to the prosecution's case but not material or favorable to Mr. Wells's case. Doc. 129, Page ID#834. It is for defense counsel rather that the prosecution to determine whether a witness should be called in the defense. Counsel would put on a defense, based on the current allegations, that Mr. Wells did not know, did not have interaction with, or had limited interaction with any of the removed witnesses. The removal deprives Mr. Wells of his Sixth Amendment right to present a defense. *See Chandler v. Brown*, 126 F.4th 1178, 1189 (6th Cir. 2025) (Due Process and Sixth Amendment Right to Present Defense).

The Government then argues that regarding the conspiracy counts, the Government will show that Mr. Wells directed subcontractors regarding their workers when federal law enforcement was on the premises, told subcontractors when "personally facilitate[ed] the concealment of illegal alien workers who were hiding in the adjacent neighborhood after Servin counter-surveilled the agents and then caused his truck to collide with the agents' Jeep at the site's entrance on January 13." Doc. 129, PageID#839. The offenses charged clearly identify individuals 1-6 as the illegal aliens referenced in this case. These are the only individuals about which Mr. Wells has received any identifying information. The Government must prove that these specific individuals were actually harbored, concealed, or shielded. Their testimony about who they were in contact that day is directly material to this issue.

The Government alleges that Mr. Wells's contact with the subcontractors is part of the evidence that will be put forward at trial to support this assertion. Doc. 129, PageID# 838. In the interview summaries provided in discovery, one of the six detained provides a phone number for

his employer. Based on the cellebrite report, it appears that phone number was not in contact with Mr. Wells. This tends to show that Mr. Wells was not in contact with that individual's supervisor about ICE activity on this jobsite.

Further, the A-files provided in discovery indicate that of individuals detained on January 13, 2026, at least three of the individuals detained were filling out paperwork at 1:10 and at 1:30. In the detention hearing, the Government emphasized that a big part of the alleged harboring is related to the text exchange with "Person 11" in the text exchanges which were introduced as Government Exhibit 2. See Doc. 37, PageID# 131. These texts took place from 12:20 PM to 4:30 PM. The timeframe of these exchanges challenges the Government's theory that one of the people that Mr. Wells was texting with was orchestrating harboring, concealment, or shielding. The timeline of these detentions and the text exchanges create serious doubt as to whether these individuals were the ones in the basement referenced by the Government in the detention hearing. Doc. 37, PageID# 131.

The Government states that Mr. Wells's argument contesting alienage "misses the proof" because the Government can establish each named alien's unlawful presence through public records. That is not the test. The A-Files indicate that at least one of the six individuals had applied for asylum at some point. At least two other individuals showed no immigration history. The individuals' testimony regarding these issues is exculpatory for a multitude of reasons: 1) the immigration court conclusions that the individuals were here unlawfully alone cannot prove this element beyond a reasonable doubt, 2) an immigrant's history of applying for legal status would be exculpatory because it would tend to show that there was a reason that a defendant would believe that the immigrant was present lawfully, 3) the nature surrounding the individuals'

statements to law enforcement is impeachment, and 4) the nature surrounding the individuals' agreement to voluntary departure would also serve as impeachment evidence.

## IV. Conclusion

The exculpatory value of the individuals' testimony was apparent when they were detained and interviewed. The Government emphasized their importance throughout the detention hearing. This meets the threshold initial showing of bad faith. The Government disputes materiality and favorability by showing evidence to rebut the exculpatory nature of the evidence that Mr. Wells has outlined. This is the exact issue. Without this testimony, Mr. Wells is deprived of his right to present exculpatory evidence. Ultimately, the Government must show that Individuals 1-6 were concealed, harbored, or shielded. Evidence that Mr. Wells was not involved with these individuals is exculpatory. The nature of this was apparent to investigators at the time of their detention and interview.

For these reasons, the Indictment should be dismissed.

Respectfully submitted this 26th day of May, 2026, by:

/s/ *Georgia A. Miller*
WADE V. DAVIES [BPR #016052]
GEORGIA A. MILLER [BPR #041197]
The Davies Law Firm, PLLC
900 S. Gay Street, Suite 802
Knoxville, TN 37902
(865) 686-6333
wdavies@wadedavies.law
*Counsel for Tyler Wells*